**IN THE COURT OF APPEALS OF IOWA**

No. 23-0907
Filed August 30, 2023

**IN THE INTEREST OF J.M.,**
**Minor Child,**

**S.M., Mother,**
 Appellant,

**C.B., Father,**
 Appellant.
_____


 Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

 A mother and father separately appeal the termination of their rights to one child. **AFFIRMED ON MOTHER'S APPEAL; REVERSED AND REMANDED ON FATHER'S APPEAL.**

 Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P., Dubuque, for appellant mother.

 Kathryn A. Duccini of Duccini Law Office, PLLC, Dubuque, for appellant father.

 Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

 Kristy L. Hefel, Dubuque, attorney and guardian ad litem for minor child.

 Considered by Tabor, P.J., Buller, J., and Blane, S.J.*

 *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BLANE, Senior Judge.**

A mother and father separately appeal the termination of their parental rights. Both argue for extensions and that it was not in the child's best interests to terminate their rights. The mother also claims her bond with the child should preclude termination.

We find no grounds to reverse termination as to the mother. But we find the father should receive six months to work toward reunification with the child.

## I. FACTS AND PRIOR PROCEEDINGS

J.M. came to the department's attention at birth, March 2022, when he and his mother, S.M., tested positive for amphetamine and cocaine.[1] S.M. has three older children who are not in her care. The Department of Health and Human Services social worker testified that of the last sixty-six months, the department has been involved with S.M. for forty-three. The earlier cases revolved around the same issue here—the mother's substance-abuse problems.

Shortly after J.M.'s birth, S.M. entered a residential treatment facility, where the baby could stay with her. But she was discharged from that program before completing it. That month, June 2022, J.M. was moved to his aunt and uncle's home, and continued to live with them for the rest of the child-in-need-of-assistance (CINA) proceedings.

Throughout the CINA proceedings, the department offered S.M. two fully supervised visitations each week. But at the termination hearing, the social worker testified S.M. had attended only seventeen of the forty-four offered. When asked

---

[1] S.M. admitted cocaine use throughout her pregnancy and was homeless at the time of J.M.'s birth.

why she missed so many visits, S.M. responded, "I don't know." But S.M. also reported that her visits were scheduled at 9:00 a.m., and the department required her to confirm two hours in advance, but 7:00 a.m. was too early for her. The social worker explained that the visits were scheduled to coincide with J.M.'s most alert and active times of the day. The mother also once admitted that she could not attend the visit because she was still drunk from the night before. The department has never considered increasing visitation time or decreasing the level of supervision because the mother had not shown her ability to parent independently. The service provider reported visitations had mixed results—the mother was mostly appropriate but also relied on others to do the direct parenting and spent a lot of time calling others on her phone.

The mother has attempted but not completed any substance-abuse treatment program. She did not complete inpatient treatment and has been inconsistent with other treatment programs and attempts. Most recently, she was discharged unsuccessfully from counselling in October 2022. The week of the termination hearing, the mother reported to the social worker that she had a substance-abuse class scheduled, but when the social worker called the provider, she learned it was only an intake appointment, and the mother ultimately did not attend. At her first and only substance-abuse evaluation, the provider could not get an accurate history of S.M.'s substance use because she appeared to be purposely vague. Also, the mother has completed only three drug tests, all of which were positive for illegal substances, including cocaine, THC, and

methamphetamine.[2]  And she testified at the termination hearing that she had used cocaine within the last month.

The mother had a mental-health evaluation in April 2023, a month before the termination hearing.  She received multiple diagnoses of mental-health and substance-abuse disorders but did not follow-up in any way.  Still, at the termination hearing, she reported she had appropriate housing and a job at a fast-food restaurant where her sister is the manager.[3]

After giving birth, while still in the hospital, the department asked S.M. to provide the names of any potential fathers, and she identified two.  The paternity test for the first-identified potential father came back negative in December 2022.  After the first paternity test was negative, the social worker testified that on December 22 she sent C.B. a letter informing him he could be J.M.'s father.  C.B. responded mid-January 2023.  The department then sent a laboratory request for paternity testing in February.  C.B. attended the appointment in March and on March 21, results came back showing C.B. is J.M.'s biological father.

When the social worker received the news, she called C.B. and left a message on his phone notifying him of the test results.  Later he asked to come to the department office and pick up the results because he did not believe they were accurate.  He declined to meet with the social worker because he felt "overwhelmed," and wanted to have his parental rights terminated.  Over several

---

[2] On numerous other occasions S.M. tampered with or removed the drug test patches.

[3]  S.M.'s sister testified that S.M. has failed to show up for work on several occasions and has been warned that if she fails to show up for work again, she will be fired.

phone calls with the social worker, C.B. and his fiancée stated he did not want to participate in services and wanted to terminate his rights. C.B. also had another open child-welfare case on his child with his fiancée.[4]

The State petitioned to terminate both parents' rights on April 11, with a hearing scheduled for May 12. On April 27, C.B. was arrested on a probation violation warrant and, following a hearing on May 5, was sentenced to fifty-six days in jail for contempt on his probation violations on felony drug charges. Then, about a week before the termination hearing, the social worker met with C.B. in the jail to have him sign voluntary termination papers. There, for the first time and after meeting with his attorney, C.B. reported he wanted reunification services.

After the May 12 termination hearing, the court terminated both parents' rights. For C.B., the court terminated parental rights under Iowa Code section 232.116(1)(h) (2023). For S.M., the court terminated parental rights under Iowa Code section 232.116(1) (h) and (*l*). The parents appeal separately.

## II. STANDARD OF REVIEW

We review termination decisions de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We will uphold an order when there is clear and convincing evidence of the statutory grounds for termination. *In re T.S.*, 868 N.W.2d 425, 434 (Iowa Ct. App. 2015). We give careful consideration to the juvenile court's factual findings and in-person observations, but we are not bound by them. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). Our top priority is the child's best interests. *See In*

---

[4] This CINA case was initiated by his criminal probation officer who contacted the department when C.B. arrived with his daughter for an appointment while he was high on marijuana. Urinalysis showed he was positive for THC and cocaine.

*re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (identifying safety and the need for a permanent home as the "defining elements" in the best-interests determination).

## III. ANALYSIS

In general, we follow a three-step analysis in reviewing the termination of a parent's rights. *P.L.*, 778 N.W.2d at 39. We first consider whether there is a statutory ground for termination of the parent's rights under section 232.116(1). *Id.* Second, we look to whether termination of the parent's rights is in the child's best interests. *Id.* (citing Iowa Code § 232.116(2)). Third, we consider whether any of the exceptions to termination in section 232.116(3) should be applied. *Id.* But in instances where the parent does not raise a claim relating to one of the three steps, we limit our review to the claims presented. *See id.* at 40 (recognizing we do not consider a step the parent does not challenge).

## IV. MOTHER

### A. Extension

S.M. first argues the court erred in denying her request for an extension of the time for reunification. Courts may delay permanency for six months only if the need for removal will be resolved in that time. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (discussing section 232.104(2)(b)). We do not see any justification in the record for an extension. S.M. has been struggling with substance-abuse for years and has made no progress in addressing those issues during this case. She has not succeeded in any form of treatment over the last year and continues to test positive for illegal drugs. We have no basis for

concluding that J.M. could be returned to her in six months. So an extension was unwarranted.

### B. Best Interests

S.M. next contends termination was not in J.M.'s best interests. We determine best interests using the framework described in section 232.116(2). *See In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). We give "primary consideration" to J.M.'s safety, to the best placement for furthering his long-term nurturing and growth, and to his physical, mental, and emotional condition and needs. Iowa Code § 232.116(2). The "defining elements" of the best-interests analysis are the child's safety and "need for a permanent home." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted). S.M.'s primary argument relates to the severance of J.M.'s relationship with his siblings. While we consider sibling relationships in child-welfare proceedings, here the more important concern is S.M.'s inability to provide a safe and stable home for any of her children, including J.M. J.M. has never lived with her—outside their brief stint in residential drug treatment—or his siblings. Given her unresolved drug use and mental-health issues, the best chance J.M. has for furthering his nurturing and growth is to sever S.M.'s parental rights.

### C. Permissive Exception

Finally, S.M. argues her strong bond with J.M. should have precluded termination. Section 232.116(3)(c) allows the court to forgo termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." S.M. bears the burden to persuade us to apply this factor. *In re A.S.*, 906 N.W.2d 467,

475–76 (Iowa 2018). The social worker testified J.M. recognizes S.M. and knows S.M. is his mother. But we see no evidence of a bond that would cause J.M. harm if severed. And S.M.'s claim of a bond is belied by J.M. being removed from her care only months after his birth, visitations being supervised, her failure to attend even half her scheduled visitations and the mixed reports of her performance during those interactions. We will not apply this exception to preclude termination. Accordingly, we find no grounds to reverse on the mother's appeal, and affirm termination of her parental rights.

## V. FATHER

C.B. makes several arguments challenging the termination of his rights. We find his appeal can be resolved on one contention, and we need not address the others.

C.B. contends the juvenile court should have given him a six-month extension to receive reunification services. C.B. testified S.M. told him he was the father in July or August, and the department did not get in touch until January.[5] S.M. testified she told C.B. he was the father when J.M. was born. In any case, there was no confirmation of his paternity until March 21, 2023. C.B. testified that when they first found out, his fiancée disagreed with him being involved with J.M. The department had confirmed an allegation of child abuse against C.B. the previous fall for using marijuana while caring for the child he had with his fiancée. C.B. declined services when offered on March 28 and said he wanted to give up his parental rights to J.M. Just fourteen days later, on April 11, the State filed the

---

[5] This is contrary to the department records which show he was notified in December 2022 that he may be J.M.'s father and a paternity test was requested.

termination petition against both parents. The court appointed C.B. an attorney on May 3, nine days before the termination hearing. And around seven days before the termination hearing, the social worker went to the jail to obtain C.B.'s voluntary resignation of parental rights. But C.B. declined and told her he wanted to start reunification services.

At the termination hearing, with his attorney, C.B. asked for both a continuance of the hearing and an extension of permanency to work toward reunification. The court said:

> [T]his continuance should not be interpreted in any way as an extension of time for [C.B.] to work on reunification or placement. . . . This child has been out of the home six months. . . . This child deserves permanency. I understand father's paternity was established in March, however, if he was in a relationship that resulted in a pregnancy, he has an obligation to investigate. There's nothing in the record that indicates he did that. So at this point, the continuance would be for [father's counsel] to prepare.

In its termination order, the court found "C.[B.] refused to engage in any services after paternity was established. It appears he has only met the child briefly on one unauthorized occasion . . . ."

We are mindful that there was a short time between C.B. getting the paternity results and his arrest for probation violations. The circumstances show the need for removal could end in six months. There are also reasons in the record to be concerned about C.B.'s parenting. In the CINA case, his fiancée reported to the department that although he is a "good dad" and "very good to be around when he is clean," she would not let C.B. be alone unsupervised with the children until he had shown "a lengthy time of sobriety." And it is evident from the record that C.B. has a substance-abuse problem that he needs to address. C.B. has only had

one short, unplanned visit with J.M. and made no further inquiry to set up visits. When making the decision of the child's long term best interests, we look to the parents' past performance because it may indicate the quality of care the parent can provide in the future. *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997).

We balance the foregoing with C.B. only serving contempt time for probation violations of fifty-six days in jail, not probation revocation and imposition of his lengthy incarceration. He was scheduled to be released in late June. And the other child abuse allegation occurred eight months before termination. The department worker testified she spoke to the other case worker, who reported C.B. was "consistent with meeting with the department" in that case but had "not been consistent in family centered services and/or solution-based casework." The caseworker also reported she meets with CB once a week, he's working on his sobriety and mental health, and his intentions with the children are good.

Also, although the court took judicial notice of a prior CINA proceeding, that case closed in 2020, well before the events here. And, at most, the department worker testified C.B. could not be reunited with J.M. on that day, but "would have to provide a pattern of sobriety and stability before that would be a consideration." Still, there is nothing in the record showing C.B. has received substance-abuse-treatment services or that he could not succeed in such services. Indeed, there has been no assessment of what the full concerns are in this case because he was only positively identified as the father seven weeks before the termination hearing.

The juvenile court and the State would impose an obligation on an unconfirmed potential father to seek out services with the department and pursue a relationship with a child even though testing had not established paternity. The

evidence of when C.B. knew he was a potential father is mixed, and he was apparently skeptical. Until December, S.M. and the department believed a different man was J.M.'s father. Still, when informed, C.B. willingly participated in paternity testing. It is troubling that after paternity confirmation in March, he stated that he wanted to forfeit his parental rights. But he had only been confirmed as the father for a few days. And the department's efforts seemed to focus more intently on S.M., given they expected C.B. to forfeit his rights based on statements he made before he had the benefit of legal advice.

Under these unique facts we find C.B.'s request to pursue reunification should be granted. J.M.'s placement should continue for another six months from the date of procedendo to give C.B. an opportunity to receive appropriate visitation and services and demonstrate he can be a sober and safe parent.

**AFFIRMED ON MOTHER'S APPEAL; REVERSED AND REMANDED ON FATHER'S APPEAL.**

Tabor, P.J., concurs; Buller, J., partially dissents.

**BULLER, Judge.** (concurring in part and dissenting in part)**.**

I join the majority in affirming termination of the mother's parental rights. But I dissent from the decision to grant the father an additional six months to work toward reunification.

Under our case law, "the juvenile court may deny termination and give the parent an additional six months for reunification *only if* the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (emphasis added) (quoting Iowa Code § 232.104(2)(b) (2021)). On this record, I cannot find that the need for removal will no longer exist after six months.

As of termination, the father was in jail serving a contempt sentence for numerous probation violations related to ongoing substance abuse and failure to attend appointments and services. I do not share the majority's reasoning that, because a district judge ordered the less-severe punishment of contempt for those probation violations (instead of revocation and prison on Class "C" drug-related felonies), there will be less need for termination six months down the road. Instead, this evidence demonstrates to me the father's continuing inability to maintain sobriety.

The father's controlled-substance abuse weighs most heavily in my mind against granting additional time. In the year leading up to termination, the father's probation officer documented at least ten positive drug tests for cocaine and at least six positive drug tests for marijuana or THC. The father also missed at least four drug-testing appointments, which we can presume also would have been positive for one or more controlled substances. *See In re C.G.*, No. 22-1948, 2023

WL 1809988, at *2 (Iowa Ct. App. Feb. 8, 2023) (citing *In re R.A.*, No. 21-0746, 2021 WL 4891011, at *1 (Iowa Ct. App. Oct. 20, 2021)).  These test results are consistent with the father's admissions to regularly smoking marijuana and using cocaine.  As the majority acknowledges, the father has not addressed his substance-abuse problems, and his fiancée previously reported he should not be left unsupervised with his children until he showed a "lengthy time of sobriety." This apprehension is based on his past abuse of smoking marijuana while caring for his other children.  In my reading of the record, I see no evidence the father has engaged in any substance-abuse treatment or has any prospect of doing so in the future.  This is the kind of "unresolved, severe, and chronic drug addiction" that we have long recognized "can render a parent unfit to raise children."  *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012).  And given the father's inconsistency in embracing services when offered, there is no reason to think these longstanding concerns will abate on their own after six additional months.

In the end, while I understand the majority opinion's inclination to give the father more time, "[i]t is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together."  *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997).  Because I do not find a sufficient basis to reverse the juvenile court's denial of a six-month extension, I dissent from that portion of the majority opinion.